## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MELVIN K. WILLIAMS, JR.,
an individual,

      7101 Silverton Court,
      District Heights, MD 20747,

            Plaintiff,

                                      No. 1:19-CV-02072

v.

GEORGE E. "SONNY" PERDUE,
in his official capacity as Secretary,
United States Department of
Agriculture,
      Serve:
      Office of General Counsel
      U.S. Department of Agriculture
      1400 Independence Avenue, S.W.
      Washington, DC 20250

      Assistant Attorney General for Administration
      U.S. Department of Justice
      Justice Management Division
      950 Pennsylvania Avenue, N.W., Rm. 1111
      Washington, DC 20530

      Office of the United States Attorney
       for the District of Columbia
      Civil Process Clerk
      555 Fourth Street, N.W.
      Washington, DC 20530

            Defendant.

## **COMPLAINT**

*Introduction*

1.      Melvin K. Williams, Jr., a former pressman in the Agriculture Department's D.C. printing shop, alleges in this suit that he was discriminated against and refused a reasonable accommodation following a severe on-the-job hand injury, after a decade or more of superior government service, and that he was retaliated against and ultimately fired, all in violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.[1]

2.      The violations began after Mr. Williams seriously injured his right (dominant) hand on the job as a printing equipment operator at USDA's Independence Avenue administrative headquarters building in 2015. His employer first pretended the injury had not occurred at all, then contended it was not serious in spite of Mr. Williams' multiple surgeries, fought his workers' compensation claim on sham defenses and lost, delayed payment by the Department of Labor of workers' compensation benefits due him, denied his repeated requests for reasonable accommodation, and then falsely claimed that he had requested no accommodation and even that he had refused such accommodation. The Department further discriminated and retaliated against him by refusing to authorize his continued leave without pay, his only option after accommodation was refused, and then firing him on the fabricated pretext that he had been absent without leave.

---

[1] Mr. Williams filed this action *pro se* in D.C. Superior Court on April 20, 2018 (Doc. 1-2), as a challenge to the Final Agency Decision dated March 29, 2018. The defendant removed the case to this Court. Notice of Removal, May 17, 2018 (Doc. 1). Following the defendant's motion for more definite statement under Fed. R. Civ. P. 12(e), filed on October 5, 2018 (Doc. 10), Mr. Williams obtained undersigned legal counsel. The Court granted the Agriculture Department's Rule 12(e) motion *ex parte*, and set November 16, 2018, as the due date for a complaint in the case. That date was extended by consent order until December 14, 2018. After the federal government shutdown of 2018-19, the Agriculture Department moved to dismiss on derivative jurisdiction grounds (Doc. 20), and the Court granted that motion (Docs. 25-26), necessitating this new filing, which is updated to include allegations about the period since the original Complaint was filed.

*Parties, jurisdiction and venue*

3.     Plaintiff Melvin K. Williams, Jr., 53, a citizen and resident of Maryland, is a former employee of the U.S. Department of Agriculture headquarters in Washington, where he was a printing and bindery equipment operator for 10 years until he was wrongfully terminated on January 17, 2017. Mr. Williams is a qualified individual with a disability within the meaning of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

4.     Defendant George E. "Sonny" Perdue is Secretary of the U.S. Department of Agriculture, an executive department of the United States government, and is sued in his official capacity for wrongs committed by his Department as alleged herein.

5.     This Court has personal jurisdiction over the defendant under the federal statutes enumerated herein.

6.     This Court has original subject matter jurisdiction over the claims asserted in this Complaint under 28 U.S.C. §§ 1331 and 1343 (3) and (4).

7.     Venue is properly laid in this District because the defendant is located, and the civil rights violations complained of occurred, in the District of Columbia.

*Facts*

8.     Mr. Williams worked as an offset printing and bindery equipment operator for the Copier and Duplicating Services Branch of the Office of Operations, USDA Division of Management, 1400 Independence Avenue, S.W., South Building, Room 0556, Washington, D.C., starting in 2005. By 2015, after approximately 10 years of service, he was a senior and valued Copier and Duplicating Services Branch employee.

9.     Mr. Williams was one of the only shop employees capable of operating, and the employee most willing to operate, the largest and most complex machine in the shop, a heavy-

duty, multi-color, high-maintenance printing press capable of handling industrial-size projects.

10.     Mr. Williams' performance evaluation for fiscal year 2015 gave him superior ratings in which he met or exceeded all job expectations.

11.     Mr. Williams' attendance and punctuality at work were exemplary. He typically arrived at work 45 minutes to an hour early to check the machinery and work areas under his responsibility in order to maximize equipment performance and productivity. He never abused the privileges of leave, access to facilities or information, or freedom of movement, attendant to his federal employment.   Nor did he fail to render honest services to the Department while employed there.

12.     On the morning of June 16, 2015, Mr. Dale Hawes, the bindery foreman at the USDA headquarters print shop where Mr. Williams worked, directed Mr. Williams to move a heavy, unwieldy GBC C800 comb-binding machine from atop a 55-gallon drum outside the print shop where it had been discarded and was awaiting disposal, and place it in a dumpster a few feet away. At Mr. Hawes' direction, Mr. Williams enlisted the help of Mr. Sebastian ("C.B.") Wiggins, one of a number of shop employees with developmental disabilities, to assist him to pick up and move the heavy binding machine.

13.     In order to carry out Mr. Hawes' order, Mr. Williams and Mr. Wiggins had to pick up the binding machine, one of them at each end of the apparatus, carry it a few feet to the side of the dumpster, step up and stand on a precariously-narrow ledge immediately at the dumpster's side, lift the machine to or above the level of their heads, heave its full weight over the dumpster wall, and drop it into the dumpster.

14.     Mr. Wiggins heaved his end of the apparatus prematurely, sending it crashing to the ground directly onto Mr. Williams' right hand, and causing either a sharp corner of the

machine, or one of its sharp-pointed metal comb blades, to slash deep into Mr. Williams' right middle finger. Blood spurted from the open wound. Mr. Williams suffered immediate and agonizing nerve pain, shooting all the way up his arm into his neck and shoulder.

15.    Mr. Williams somehow freed his hand from underneath the fallen machine, recovered his footing, and ran inside the print shop, holding his bloody hand in the air, to secure first aid. Mr. Spencer, seeing him, found some bandage material in Mr. Williams' desk, used it to wrap Mr. Williams' hand, and gave him immediate permission to go to the building infirmary. There a nurse examined Mr. Williams' hand, diagnosed a severe laceration that had cut the right middle finger almost to the bone, urged an immediate visit to the emergency room, and called Mr. Spencer to say she was sending Mr. Williams there.

16.    Mr. Williams' spouse, Thomasica L. Williams, drove to the Agriculture Department as swiftly as she could, picked up Mr. Williams and drove him to the Kaiser Permanente facility in Largo, Maryland, where he was given expert wound care, a large splint, and instructions to see the orthopedic surgical team at Gaithersburg Medical Center, the Kaiser Permanente hospital facility in Gaithersburg, Maryland, as soon as possible. He was told to stay away from work until further notice.

17.    On the day of the injury, Mr. Williams spoke by telephone with his second-line supervisor, Ms. Annette James, chief of the Copier and Duplication Branch. He informed Ms. James of the circumstances of the injury and its severity, and of the medical requirement that he not work until further notice.

18.    As of the time of the conversation referred to in the preceding paragraph, Mr. Williams was, and demonstrated to his employer that he was, a qualified person with a disability under Section 504.

19.     During that telephone conversation Ms. James explicitly assured Mr. Williams, several times, that she had a light duty opportunity for him and would place him on light duty whenever he was able to return to work.

20.     On June 22, 2015, Shital S. Desai, M.D., a Kaiser Permanente physician, wrote a note stating that Mr. Williams was unable to work from the time of the injury until at least June 28, 2015, and would be re-evaluated at that time.

21.     Mr. Williams hand-delivered Dr. Desai's note promptly to his employer.

22.     On June 23, 2015, Mr. Williams was seen by Kaiser Permanente orthopedist Kelly A. Martens, M.D., who wrote a note stating that Mr. Williams "will need [surgical] repair [of] his middle finger and will be out of work until further notice."

23.     Mr. Williams hand-delivered Dr. Martens' note promptly to his employer.

24.     On June 24, 2015, Mr. Williams was scheduled for surgery on July 2, 2015, preceded by in-hospital pre-surgical tests on June 25, 2015, and a history and physical exam on June 26, 2018, and followed by a post-operative appointment on July 13, 2015.

25.     On July 2, 2015, at Kaiser Permanente's hospital in Gaithersburg, Maryland, Mr. Williams underwent the first of what ultimately were five surgeries on his right hand.

26.     On the day of the first surgery, a work status report was completed by Kaiser Permanente orthopedic surgeon Sean T. Johnson, M.D., stating that Mr. Williams would be "placed off work from July 2, 2015, [until] August 16, 2015."

27.     Mr. Williams hand-delivered Dr. Johnson's report, or caused it to be hand-delivered, promptly to Kirk Spencer, his immediate supervisor.

28.      On August 10, 2015, Mr. Williams was seen by Dr. Johnson for a post-operative follow-up appointment.

29.   Immediately after that appointment, Mr. Williams began preparing for a return to work, expecting the light duty that Ms. James had promised would be waiting for him.

30.   On or about the same day, August 10, 2015, Mr. Williams contacted the Agriculture Department to inquire about his leave status, and was told he had no available sick leave and would be, or had been, placed on leave without pay.

31.   On or about the same day, August 10, 2015, Mr. Williams contacted Ms. James to explain his post-injury physical limitations and re-confirm that his employer would accommodate them. Ms. James told him to "come back to work," and assured him again that the Copier and Duplication Branch would "give [him] something to do" that he could do within his limitations.

32.   On or about August 11, 2015, Mr. Williams visited the Agriculture Department-wide personnel office in the USDA Division of Management at 39-W, Whitten Building, and followed formal procedures for requesting light duty as a reasonable accommodation for his post-injury disability. He completed the appropriate reasonable accommodation request form, with the assistance of Ms. Natalie Veeney, reasonable accommodation coordinator in that office, and formally submitted that form to the Agriculture Department on September 21, 2015.

33.   Mr. Williams' reasonable accommodation request was accompanied by a work status report form from Dr. Johnson, his treating orthopedic surgeon, dated September 10, 2015, which explicitly stated that Mr. Williams could do "modified" activity at work and at home, and that the modification was "no use of right hand."

34.   Upon returning to work, on or about September 15, 2015, Mr. Williams tried without success to get Ms. James to tell him what work she had found, or would find, for him to do within his physical limitations. She ignored him.

35.     Mr. Williams' immediate supervisor, Kirk Spencer, instructed him during his first few days back at work in September 2015 to "go run the press." When Mr. Williams protested that his injury rendered him unable to perform critical functions of operating that complex machine, Mr. Spencer ignored him.

36.     Mr. Williams attempted several times to have Mr. Spencer sign the reasonable accommodation request form described in Paragraph 32 above, and each time Mr. Spencer refused to sign and gave no reason. When Mr. Williams checked on the matter with his personnel office, he was told that Mr. Spencer's signature was essential to processing the request and that he had not signed.

37.     No one else at the Agriculture Department responded to Mr. Williams' request for reasonable accommodation, either by granting an accommodation or by informing him that the submitted information was incomplete or did not justify an accommodation.

38.     No one at the Agriculture Department gave Mr. Williams any guidance or assistance in inducing Mr. Spencer, or any of Mr. Williams' supervisors, to sign the reasonable accommodation request form.

39.     Thereafter the Agriculture Department falsely, and inconsistently, maintained that Mr. Williams had not submitted an accommodation request, that he required no accommodation, and/or that he was offered an accommodation but declined or refused it.

40.     While struggling to perform job tasks that his injury made impossible, Mr. Williams pleaded with his supervisors to give him duties that he could perform with his physical limitations. They ignored his entreaties and gave him no accommodation whatever, and refused to honor Dr. Johnson's medical restriction on his on-the-job activities.

41.     Rather than give Mr. Williams the light physical duty he had requested and had been promised by Ms. James, his supervisors instead ordered him to do more work requiring the use of his right arm and hand than he had performed before the injury.

42.     At the same time—almost immediately after Mr. Williams returned to work following his August 2015 surgery—he began to notice that his co-workers were keeping their distance from him, giving him the "silent treatment," *i.e.*, refraining almost entirely from talking to him, even in passing, and addressing him—if at all—by his formal name, Melvin, instead of friendly nicknames they were wont to use before the injury.

43.     The jarring unpleasantness of his co-workers' suddenly cold and distant behavior, and its uniformity among his co-workers, made it obvious to Mr. Williams that they were all acting on the same instruction from their superiors.

44.     At the same time Mr. Williams also began noticing that Ms. James had stopped talking to him entirely, and instead had begun having frequent one-on-one conversations with Mr. Marcus Washington, his co-worker, which she had not done before Mr. Williams' injury.

45.     During the fall of 2015 Mr. Williams pursued his accommodation request through Ms. Veeney, who set up several meetings with Mr. Williams and his immediate supervisor, Mr. Spencer, to discuss accommodating Mr. Williams' physical limitations at work. Mr. Spencer failed to show up to a single one of those meetings.

46.     The Agriculture Department took no steps to compel Mr. Spencer's appearance at any such meeting, to substitute someone else in authority who could and would be present, or otherwise to move Mr. Williams' accommodation request forward.

47.     As shown by Mr. Williams' USDA time and attendance ("T & A") records for the period from September 15, 2015, through October 2, 2015, approved by a timekeeper and by

his supervisor Mr. Spencer, he worked a total of 61 regular hours, and was approved for 90 hours of annual leave and 9 hours of holiday leave.

48.     Meanwhile, on or about September 9, 2015, Mr. Williams filed for workers' compensation benefits with Mr. David Najafi, workers' compensation coordinator in the Office of Human Resources Management in the Agriculture Department's Division of Management.

49.     During the workers' compensation application process that ensued, Mr. Najafi decided or recommended to the U.S. Department of Labor, Office of Workers' Compensation Programs—unfairly, arbitrarily, and based on an irrational bias—that Mr. Williams' workers' compensation claim be denied, first on the clearly false "ground" that his injury had not occurred as stated, or indeed had not occurred at all, and later on the equally false and irrelevant "ground" that his injury was not serious enough to render him unable to work for any length of time.

50.     Mr. Najafi also failed or refused to submit documents in his possession that he knew or had reason to know (a) were essential to the processing of Mr. Williams' claim for workers' compensation benefits, and (b) were his responsibility to gather and transmit.

51.     Mr. Najafi's deliberate actions and omissions described above directly resulted in the denial of Mr. Williams' workers' compensation claim, which was issued by letter dated October 15, 2015, from the U.S. Labor Department's Office of Workers' Compensation Programs.

52.     Meanwhile, on October 1, 2015, Ms. James updated Mr. Najafi via e-mail on Mr. Williams' return to work. The e-mail purported to address his physical limitations, but did not do so accurately. In particular, it did not indicate that Mr. Williams was under a medical order barring the use of his right hand, but merely mentioned that some tasks might be

"challenging" due to "the limited use of the injured finger." The e-mail also stated that, "[A]s of today, we have not tested [Mr. Williams'] operation of the printing press." This assertion misrepresented the fact, alleged in Paragraph 35 above, that Mr. Spencer had already directed Mr. Williams to "go run the press" and had ignored Mr. Williams' response that his right-hand limitation rendered him physically unable to operate that complex machine fully and safely or to keep it supplied and running.

53.     On October 1, 2015, Mr. Williams was seen by Dr. Desai, who diagnosed the need for a second surgery on Mr. Williams' hand and wrote a work status report stating that Mr. Williams "may return to work October 2, 2015," and work as he was able until his surgery.

54.     Mr. Williams promptly hand-delivered Dr. Desai's report, or caused it to be hand-delivered, to Kirk Spencer, his immediate supervisor.

55.     As shown by Mr. Williams' USDA time and attendance ("T & A") records, approved by a timekeeper and by his supervisor Mr. Spencer, for the period from October 2, 2015, through November 19, 2015, he worked a total of 194.15 regular hours, and was approved for 9 hours of holiday leave, 2 hours of administrative leave, and 17.45 hours of leave without pay.

56.     On October 2, 2015, Mr. Williams' second surgery was scheduled for November 20, 2015, preceded by a pre-operative appointment on November 9, 2015, and followed by a post-operative appointment on December 2, 2015.

57.     Mr. Williams notified his employer of the November 20th surgery on November 2, 2015, by means of a letter which began, "To whom it may concern[.]" Mr. Williams gave copies of the letter to Mr. Spencer and Ms. James as soon as he arrived at work that day, a Monday.

58.     Later that same day, November 2, 2015, Ms. James called Mr. Williams into her office. Mr. Spencer was present. Ms. James told Mr. Williams that because he had no annual leave days remaining, and because his workers' compensation claim had been denied, there was "nothing else [they] could do for [him]" in terms of paid leave. Mr. Spencer later left for Mr. Williams a form by which he could request donated leave from the USDA employees' voluntary leave bank.

59.     Mr. Williams went to the Department personnel office with that form, intending to apply for donated leave, but was told instead to seek legal advice in challenging the denial of his workers' compensation claim, since his leave needs arose from an on-the-job injury.

60.     Mr. Williams underwent his second surgery on November 20, 2015, at Kaiser Permanente's surgical facility in Gaithersburg, Maryland. On the same day, Dr. Johnson, his orthopedic surgeon, completed a work status report form stating that Mr. Williams was "placed off work" from November 20, 2015, until January 3, 2016, to recover from the surgery.

61.     Dr. Johnson completed another work status report form on January 6, 2016, limiting Mr. Williams to "modified activity" at work and at home through March 6, 2016, and specifying that the modification was "no use of right hand."

62.     Both these work status report forms were delivered promptly to Mr. Williams' supervisor or supervisors.

63.     As shown by Mr. Williams' time and attendance ("T & A") records for the period from January 10, 2016, through March 4, 2016, he worked a total of 203.3 regular hours and 24 overtime hours, and was approved for 39 hours of holiday and hazardous weather leave, 1.15 hours of annual leave, and 75.75 hours of leave without pay. The T & A records were all signed by a timekeeper and approved by a supervisor.

64.     On March 8, 2016, Mr. Williams underwent a third operating-room surgery on his right hand, a "nerve wrap" and related procedures designed to address severe and chronic right arm, shoulder and neck pain arising out of the original injury.

65.     At or about this time, when it became apparent to Dr. Johnson that Mr. Williams' supervisors had refused any accommodation that would allow Mr. Williams to work without using his right hand, and based on his medical knowledge that attempts to use that hand occupationally would worsen the injury's severity and duration and inflict still more pain on his patient, he placed Mr. Williams on a medical order not to work at all.

66.     Dr. Johnson filled out a work status report on March 8, 2016, stating that Mr. Williams was "placed off work" until April 21, 2016.

67.     The work status report described in the preceding paragraph was transmitted promptly to Mr. Williams' supervisors.

68.     Dr. Johnson filled out a work status report on March 31, 2016, stating that Mr. Williams was "placed off work" until April 30, 2016.

69.     The work status report described in the preceding paragraph was transmitted promptly to Mr. Williams' supervisors.

70.     Dr. Johnson filled out a work status report on May 2, 2016, stating that Mr. Williams was "placed off work" from that date until June 16, 2016.

71.     The work status report described in the preceding paragraph was transmitted promptly to Mr. Williams' supervisors.

72.     Dr. Johnson filled out an attending physician's report for the U.S. Department of Labor, Form CA-20, stating that Mr. Williams was unable to work from June 16, 2016, to November 24, 2016.

73.     The attending physician's report described in the preceding paragraph was delivered promptly to the Department of Agriculture.

74.     Dr. Johnson filled out a work status report on July 14, 2016, stating that Mr. Williams was "placed off work" from June 20, 2016, through September 14, 2016.

75.     The work status report described in the preceding paragraph was transmitted promptly to Mr. Williams' supervisors.

76.     Dr. Johnson filled out a work status report on or about September 21, 2016, stating that Mr. Williams was "placed off work" from September 14, 2016, until November 21, 2016.

77.     The work status report described in the preceding paragraph was transmitted promptly to Mr. Williams' supervisors.

78.     Dr. Johnson filled out a work status report on November 11, 2016, stating that Mr. Williams was "placed off work" from that date until January 11, 2017.

79.     The work status report described in the preceding paragraph was transmitted promptly to Mr. Williams' supervisors.

80.     On December 9, 2016, Mr. Williams underwent a fourth operating-room surgery—a neurectomy, or nerve-severing procedure—in an attempt to lessen the severe and recurrent injury-related pain in his right hand, arm, shoulder and neck. That procedure was unsuccessful, and left Mr. Williams' right hand even less usable than before.

81.     Dr. Johnson filled out a work status report on January 11, 2017, stating that Mr. Williams was "placed off work" until April 11, 2017.

82.     The work status report described in the preceding paragraph was transmitted promptly to Mr. Williams' supervisors.

83.    On February 12, 2017, Dr. Johnson performed an in-office surgical procedure to re-insert nerve fibers that had escaped through the December 2016 surgical incision and had become exposed to the air.

84.    Dr. Johnson filled out a work status report on March 6, 2017, stating that Mr. Williams was "placed off work" until June 6, 2017.

85.    The work status report described in the preceding paragraph was transmitted promptly to the Department of Agriculture.

86.    Dr. Johnson's medical orders placing Mr. Williams "off work" were made in direct response to, and would not have been made but for, the failure or refusal of Mr. Williams' supervisors to give Mr. Williams work that did not require the use of his right hand.

87.    Dr. Johnson's medical orders to Mr. Williams not to work were intended to continue in effect until Mr. Williams regained sufficient use of his right hand to enable him to perform work requiring its use.

88.    Mr. Williams' supervisors knew, or had reason to know, that Dr. Johnson's medical orders to Mr. Williams not to work were continuing as described in the preceding paragraph.

89.    Meanwhile, on August 16, 2016, the denial of Mr. Williams' workers' compensation claim was reversed on reconsideration, and Mr. Williams was adjudged entitled to benefits.

90.    On September 19, 2016, almost exactly one month later, Mr. Williams received a notice of proposed removal from his job at the Agriculture Department.

91.    The proposed removal claimed that Mr. Williams had had excessive unauthorized absences, and was apparently based on letters dated January 12, 2016; June 23, 2016; and August 9, 2016. The allegations in these letters were incorrect, as follows:

a.  The leave days asserted in the January 12 letter as not requested in advance, November 23 through 26, 2015, were in fact requested on November 2, 2015, as described in Paragraph 57 above.

b.  The leave days asserted in the June 23 letter as not requested in advance, February 10 through March 4, 2016, and June 20 through 23, 2016, were in fact requested, respectively, in work status reports prepared by Dr. Johnson on January 6, 2016, as described in Paragraph 61 above, and July 14, 2016, as described in Paragraph 74 above, as well as in the attending physician's report described in Paragraph 72 above.

c.  The documents described in the August 9 letter as inadequate, which the letter admits were supplied on July 14, 2016, were in fact more than sufficient to explain Mr. Williams' injury, indicate the period of treatment or care, present the provider's signature and contact information, and indicate an expected date of partial or full recovery and return to work.

92.  On September 30, 2016, Mr. Williams submitted voluminous materials in protest of the proposed removal, including work status reports and a letter from Dr. Johnson, his treating surgeon, explaining in detail the nature, severity, duration and prognosis of Mr. Williams' injury and reiterating that it precluded the occupational use of Mr. Williams' right hand.

93.  On January 17, 2017, Mr. Williams was fired from his Agriculture Department job, on the purported ground of excessive absence from work without leave.

94.  The Department's decision to terminate Mr. Williams' employment could not have been, and was not, based on fact, since (a) Mr. Williams' was absent from work under medical orders that flowed from the Department's refusal to give him work that spared his

right hand, and (b) his termination was based on the flawed and disingenuous letters described in Paragraph 89 above, which give evidence that the termination was grounded in and served the discriminatory motives of Mr. Williams' supervisors, and constituted  and/or were designed to contrive a pretext for discriminating against Mr. Williams based on his disability.

95.     Mr. David Najafi, the USDA workers' compensation coordinator referred to in ¶ 48 above, made or recommended the argument in Mr. Williams' workers' compensation case that Mr. Williams had not been injured as he stated, or not injured on the job at all.

96.     Mr. Najafi made or recommended the argument in Mr. Williams' workers' compensation case that his injury was not serious enough to warrant workers' compensation payments.

97.     Mr. Najafi deliberately failed or refused to convey to the U.S. Department of Labor, Office of Workers' Compensation Programs, documents and/or other information in his possession that he knew or had reason to know was essential to a determination on Mr. Williams' initial application for workers' compensation benefits.

98.     Mr. Najafi repeatedly obstructed and/or refused to convey such information, and/or to approve continuing payment of workers' compensation benefits for Mr. Williams, even after Mr. Williams won his claim to those payments on reconsideration in August 2016.

99.     Mr. Najafi falsely claimed, in support of his refusal to accept work status reports on Mr. Williams from Kaiser Permanente, that Mr. Williams' or Kaiser's paper submissions were wrong, incomplete, or inadequate, and/or that Mr. Williams was forging the signature of one or more of his treating physicians.

100.    Mr. Najafi, or someone from the Department of Agriculture acting at his direction, contacted Kaiser Permanente in 2016, 2017 or 2018 and informed them falsely that Mr. Williams had died.

101.    From November 2018 until the date of this filing, Mr. Najafi has refused to process any submissions by or on behalf of Mr. Williams

102.    The acts and omissions of Mr. Najafi described in Paragraphs 95 through 100 above constituted and/or were intended to contrive a pretext for discrimination against Mr. Williams based on his legitimate disability.

103.    As a proximate result of the actions of Agriculture Department personnel in this case, Mr. Williams suffered at least the following harms:

   a.   Loss of income leading to a forced Chapter 11 bankruptcy filing.

   b.   Loss of the ability to provide for and support his family.

   c.   Severe strains on his marriage, and prolonged separation from his spouse and children.

   d.   Loss of his home to mortgage foreclosure.

   e.   Loss of his car due to inability to make loan installment payments.

   f.   Loss of quality of life flowing from these and other hardships related to loss of income.

   g.   Severe anxiety, stress, depression, emotional pain and suffering resulting from the foregoing, as well as from the Agriculture Department's indefensible refusal to process his otherwise valid workers' compensation requests, and its perverse insistence on attempting, through a collection agency, to recover workers' compensation payments already made, following the determination

that Mr. Williams was not entitled to benefits but before that determination was reversed on reconsideration.

## Count I:
### *Disability-based discrimination under Section 504*

104.   The preceding paragraphs of this Complaint are incorporated in their entirety herein by reference.

105.   Mr. Williams is a qualified individual with a disability within the meaning of Section 504; timely filed an administrative charge of disability discrimination using the applicable USDA EEO mechanism; and timely filed the present civil action.

106.   Mr. Williams' supervisors in Copier and Duplicating Services, Annette James, Dale Hawes, and Kirk Spencer, indulged and maintained, against overwhelming medical evidence, the inaccurate, ignorant, biased and irrational belief that Mr. Williams had no disability following his on-the-job injury, and that he deserved neither a workplace accommodation nor workers' compensation for his workplace injury.

107.   The copying and duplication shop where Mr. Williams worked was kept in operation, while those of other federal departments and agencies were closed, at least in some part because of the Agriculture Department's otherwise laudable policy of hiring developmentally- disabled support workers whose presence in the workforce enhanced the Department's record of diversity in hiring.

108.   Mr. Williams' supervisory employees were aware that the accidental injury to Mr. Williams' hand had resulted from the actions of one of the shop's developmentally- disabled employees, Mr. C.B. Wiggins, and were concerned that the widespread knowledge of Mr. Williams' accident might cause the reassignment or termination of employees like Mr. Wiggins, followed by the closing of the shop and the loss of their own jobs.

109.     Supervisory employees in the shop were aware that the accident had resulted from Dale Hawes' unnecessary, capricious, petty and physically dangerous instruction to Mr. Williams to move a heavy piece of discarded equipment a trivial distance from one outside location to another, to lift the equipment manually overhead in an inherently dangerous manner, and to use Mr. Wiggins' help for this task instead of that of an employee without developmental disabilities; that this instruction under all the circumstances was highly ill-advised and showed sanctionable disregard for employees' safety; and that Mr. Hawes therefore bore a significant degree of responsibility for the accident.

110.     To protect themselves from job loss and/or discipline as described in the preceding two paragraphs, Mr. Williams' supervisors (a) unfairly blamed Mr. Williams for the accident, and (b) falsely understated the severity of Mr. Williams' resulting injury. The supervisors' willful denial of the true cause of the injury, and the severity of its effects, led them to discriminate against Mr. Williams based on his disability by pretending that such disability did not exist.

111.     Mr. Williams' supervisors, including Ms. James, made and voiced the incorrect, irrational, arbitrary and discriminatory inference that Mr. Williams was trying to "milk" his injury, either for monetary gain or for undeserved light-duty work assignments.

112.     Mr. Najafi made, acted on, and continues to act on, the impermissible inference that Mr. Williams' injury was nothing more than an insignificant cut on his finger, even though he was presented with overwhelming medical evidence that the injury was traumatic and severe enough to require multiple separate surgeries and permanently preclude the occupational use of Mr. Williams' right hand.

113.     In carrying out his official duties with regard to Mr. Williams' disability, Mr. Najafi indulged, cand continues to indulge, the medically inaccurate, ignorant, biased and

irrational belief that Mr. Williams has no disability, and that he deserves neither workplace accommodation nor workers' compensation benefits.

114.   Mr. Najafi contended, and never retracted his contention, that a certain surveillance video showed Mr. Williams using his injured hand, which Mr. Najafi alleged was his left, when in fact Mr. Williams' right hand was the injured one. Mr. Najafi had ample reason to know which of Mr. Williams' hands had been injured, because he was the keeper of medical records in the Agriculture Department's possession concerning Mr. Williams' injury, and was the originator of the Department's various shifting pretextual arguments against Mr. Williams' workers' compensation claim.

115.   Mr. Najafi, acting on the same discriminatory motive alleged in the preceding three paragraphs, and in retaliation for Mr. Williams' continued assertion of physical impairment, repeatedly and without legitimate basis rejected, and continues to reject, Mr. Williams' completed CA-7 work status forms, thereby delaying payment of workers' compensation benefits owed to Mr. Williams; purposefully withheld and continues to withhold any assistance that might have helped Mr. Williams overcome the petty bureaucratic obstacles that Mr. Najafi himself was placing in Mr. Williams' path; and thereby knowingly, deliberately and intentionally caused, and continues to cause, substantial interruptions and arrearages in Mr. Williams' workers' compensation payments.

116.   The inferences, contentions and actions against Mr. Williams described in this Count were unfounded, contrary to fact, and rooted in impermissible bias, and constituted disparate treatment of Mr. Williams by the Agriculture Department based on disability in violation of Section 504 of the Rehabilitation Act of 1973, *as amended*, 29 U.S.C. § 794.

117.   These wrongs proximately caused immediate, substantial and lasting harms to Mr. Williams' physical, economic, emotional, and psychological well-being, to his self-esteem

and quality of life, and to his future career and earning power, including but not limited to the harms listed in Paragraph 102 above, as will be proven at trial.

### Count II:
### *Failure to accommodate under Section 504*

118.    The preceding paragraphs of this Complaint are incorporated in their entirety herein by reference.

119.    The Agriculture Department, as a U.S. federal agency, is required under Section 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 791, to take reasonable affirmative steps to accommodate individuals with disabilities, except where undue hardship would result. Federal employers have greater duties to accommodate disabled workers under Section 501 than the duties owed by federal grantees under Section 504 or those owed by employers under the ADA.

120.    The provision of light physical duty work for an employee with little or no use of his dominant hand was a reasonable accommodation under Section 504 that imposed no undue hardship on the employer.

121.    Mr. Williams was capable of performing such light physical duty work at all times following his return to work in September 2015 after his first surgery.

122.    Mr. Williams repeatedly asked for the reasonable accommodation of light physical duty described in this Complaint, thus fulfilling—many times over—his obligation under Section 504 to make his disability known to his supervisors and to seek a reasonable accommodation therefor.

123.    The Agriculture Department failed or refused to accommodate Mr. Williams' disability while he worked at the Department's print shop, from his September 2015 return to work until his January 2017 termination, in violation of Section 504, (a) by repeatedly failing to provide him with the reasonable accommodation of light physical duty, (b) by pretending that

the only accommodation he sought was a permanent dispensation from having to work at all, (c) by failing to cause or induce its supervisory employees, through training, monitoring and disciplinary action, to afford Mr. Williams the reasonable accommodation of light physical duty, and (d) by displaying and maintaining a callous indifference to his need for light physical duty as a reasonable accommodation.

124.    The mistreatment of Mr. Williams described in this Complaint and in this Count was based on false and biased suppositions about his qualifications or ability given his post-injury impairments, and/or based on the bare desire of his supervisors, and of Mr. Najafi, to harm or disparage him on account of his disability.

125.    These wrongs proximately caused immediate, substantial and lasting harms to Mr. Williams' physical, economic, emotional, and psychological well-being, to his self-esteem and quality of life, and to his future career and earning power, including but not limited to the harms listed in Paragraph 102 above, as will be proven at trial.

## Count III:
### Retaliation

126.    The preceding paragraphs of this Complaint are incorporated in their entirety herein by reference.

127.    The Agriculture Department and its personnel, as alleged in this Complaint, retaliated against Mr. Williams for opposing practices made unlawful by Section 504, specifically:

    a.    The employer's failure or refusal to recognize Mr. Williams' disability as legitimate.

    b.    The employer's irrational and biased insistence that his injury was "just a cut" or was otherwise not serious enough to merit any consideration or accommodation.

c.   The employer's instruction to Mr. Williams' co-workers to ostracize and isolate him in the workplace.

d.   The employer's brazen use of patently meritless sham "defenses" to Mr. Williams' workers' compensation claim.

e.   The employer's repeated, protracted and continuing refusal to process his workers' compensation payment papers following the adjudication in his favor of his claim to those payments.

f.   The employer's incorrect and invidious insistence that Mr. Williams had not requested an accommodation.

g.   The employer's blatant failure to make reasonable accommodation for Mr. Williams' right hand limitations by giving him readily available, indeed promised, light physical duty that spared his having to use that hand.

h.   The employer's knowing use of a series of incorrect assertions about Mr. Williams' leave as a pretext for proposing to terminate him.

i.   The employer's knowingly dishonest, mendacious and defamatory assertion that Mr. Williams had been seen using his injured hand in a way that supposedly demonstrated he was faking or malingering.

128.   Mr. Williams' active opposition to these practices made unlawful by Section 504 led directly to his termination.

129.   As a proximate result of the retaliation complained of in this Count, Mr. Williams suffered immediate, substantial and lasting harms to his physical, economic, emotional, and psychological well-being, to his self-esteem and quality of life, and to his future career and earning power, including but not limited to the harms listed in Paragraph 102 above, as will be proven at trial.

*Prayer for relief*

130.   WHEREFORE, plaintiff Melvin K. Williams, Jr., respectfully prays as follows:

   i.   That this Court take and retain jurisdiction of this matter for the
        purpose of affording full and complete declaratory, injunctive and
        monetary relief.

  ii.   That the defendant be declared to have discriminated against Mr.
        Williams under Section 504; to have failed to recognize and
        accommodate his disability; and to have retaliated against him for
        opposing practices made unlawful by Section 504, as alleged in this
        Complaint.

 iii.   That the defendant be ordered to reinstate Mr. Williams immediately to
        his pre-firing employment, with light physical duty as an
        accommodation for as long as Mr. Williams' treating physician deems it
        necessary, i.e., until the said physician communicates to the defendant
        that light physical duty for Mr. Williams is no longer necessary.

  iv.   That the defendant and all its personnel be permanently enjoined from
        discriminating against Mr. Williams based on his disability, including
        the making of any further assertion that his on-the-job injury of June 16,
        2015, did not result in an occupational disability, and from any further
        retaliation based on his seeking of accommodation or other relief,
        including the pursuit of the present litigation.

   v.   That the defendant be ordered immediately to remove and recuse Mr.
        David Najafi from any role in processing or adjudicating, or advising
        others in processing or adjudicating, Mr. Williams' present or future

claims for workers' compensation, or for continued payment of any such compensation, and to order its personnel to refrain from obstructing future approval of any future workers' compensation payments Mr. Williams may make based on the injury alleged in this Complaint.

vi. That the defendant be ordered to cease and desist, immediately and permanently, and to cause any and all other agents or instrumentalities of the U.S. Government to cease and desist immediately and permanently, from any effort to collect a purported debt of Mr. Williams to the Agriculture Department stemming from alleged overpayment of workers' compensation benefits to which he has been found entitled.

vii. That the defendant be ordered to pay immediately to Mr. Williams all sums necessary to restore retroactively his full salary and benefits, including retirement plan contributions and any difference between such full salary and benefits and workers' compensation already paid, for all pay periods for which less than all such pay and benefits were paid between June 16, 2015, and the date of judgment.

viii. That the defendant be ordered to pay immediately to Mr. Williams and/or his doctors all workers' compensation payments owed to him that were blocked or obstructed by defendant's personnel.

ix. That the defendant be ordered to pay Mr. Williams the sum of $1,000,000.00 as compensatory damages for the emotional distress, pain and suffering it has inflicted on him as alleged herein, together with statutory pre- and post-judgment interest.

    x.  That the defendant be ordered to pay Mr. Williams' costs of suit, including attorneys' fees, under Section 504a of the Rehabilitation Act of 1973, *as amended*, 29 U.S.C. § 794a.

    xi.  That the Court order such other and further declaratory, injunctive and/or monetary relief as it deems just and proper.

### *Jury demand*

131.  The plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

_____
Stephen B. Pershing, Esq.
D.C. Bar No. 482580
Pershing Law PLLC
1416 E Street, N.E.
Washington, D.C. 20002
(202) 642-1431
steve@pershinglaw.us

_____/s/_____
Harold L. Levi, Esq.
D.C. Bar No. 223537
(Admission *pro hac vice* pending)
The Law Office of Harold Levi
14009 Breeze Hill Lane
Silver Spring, MD 20906
(301) 216-9830
hlevi32847@aol.com

*Counsel for plaintiff*

Dated: July 11, 2019

^   ^   ^   ^